Filed 6/29/20 Modified and Certified for Publication 7/13/20 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOANNA GOMEZ,<br><br>    Defendant and Appellant. | D076101<br><br><br><br>(Super. Ct. No. RIF128455) |

APPEAL from an order of the Superior Court of Riverside County, John D. Molloy, Judge.  Affirmed.


Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Lynne G. McGinnis and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant and defendant Joanna Gomez appeals from an order summarily denying her petition to vacate her 2009 murder conviction and to be resentenced on any remaining counts under Penal Code section 1170.95.[1]  She contends that (1) the summary denial of her petition was error because she made the required prima facie showing that she is entitled to relief under section 1170.95; and (2) the court violated state law and her constitutional right to due process by summarily denying her petition in her absence and without giving her the opportunity to file a reply to the prosecution's response to her petition.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A jury convicted Gomez and codefendant Ivan Renne Salinas of first degree murder (§ 187, subd. (a)).  As to both defendants, the jury found as special circumstances that the murder was committed during the commission of a robbery (§ 190.2, subd. (a)(17)(A)) and a kidnapping (§190.2, subd. (a)(17)(B)).  As to Salinas, the jury also found true the special circumstance allegation that the murder was committed by means of lying in wait (§ 190.2, subd. (a)(15)).[2]  Gomez and Salinas were both sentenced to state prison for life without the possibility of parole.

---

[1]     All further statutory references are to the Penal Code.

[2]     As to Gomez, the jury was unable to reach a verdict on the lying-in-wait special-circumstance allegation.  The court declared a mistrial on that issue and dismissed the lying-in-wait allegation as to Gomez at the People's request.

The following facts about the murder are taken from this court's unpublished opinion in Gomez's direct appeal, *People v. Gomez* (Dec. 13, 2011, D056959), in which this court affirmed the judgment.

"*Prosecution Evidence*

"The homicide

"On the night of October 30, 2005, Joseph Ravida was fatally shot in the passenger seat of his van, which his stepdaughter Gomez was driving, and Gomez was shot in the right arm. At around 9:20 p.m. that night, Danny Calderon was driving northbound on Bain Street in Mira Loma with his girlfriend and brother. As he approached 54th Street, he saw Gomez in his lane, waving her arms for him to stop, and Ravida's van parked on the side of the road off the southbound lane. He did not stop but his girlfriend called 911.

"Riverside County Deputy Sheriff Russell Williams arrived on the scene and saw Gomez in the roadway by Ravida's van waving her arms. He asked her if she was okay, and she said, '[t]hey shot my father,' and '[t]hey shot me in the arm.' Williams saw that Ravida was sitting upright in the passenger seat of the van with his seatbelt still strapped on. He appeared lifeless and a paramedic confirmed that he had no pulse. The front passenger door window was shattered but there was no glass on the ground below the door until the door was opened and portions of the shattered window fell out. Williams did not find any bullets or cartridges at the scene. Williams found Ravida's wallet in the intersection of 54th and Bain. The wallet contained a credit card and cash. Gomez told Williams that two men wearing white Halloween masks had gotten into the van and

3

ordered her to drive on various streets until she was 'basically lost.' At some point while she was driving, they shot Ravida and then shot her as she was stopping the van. After talking to Williams, Gomez was taken to a hospital by ambulance.

"Detectives who investigated the crime scene found no bullets or bullet casings in the area surrounding the van, and no bullet or bullet strike mark inside the van. A pair of eyeglasses was found on the floorboard of the van. The frame was bent and the right lens was missing. There were containers of Chinese food on the floorboard behind the front passenger seat and bags of dog food and groceries in the rear storage area of the van.

"Ravida was shot three times in the head—on the top, back, and left side—and was shot twice in the left side of his back. All of the bullet wounds were fatal, and the head wounds would have caused immediate unconsciousness.

"<u>Gomez's relationship with Ravida</u>

"Gomez's mother, Christina Gomez (Christina) met Ravida in 1973 and began living with him that year in an intimate relationship that lasted 19 years. Gomez was born in 1984 and although Ravida was not Gomez's biological father, he agreed to raise her as his daughter. He referred to Gomez as his daughter and 'baby girl' and treated her as his own child, and Gomez called him 'Daddy' or 'Dad.' When Christina ended her intimate relationship with Ravida in 1992, she and Gomez moved out of his house. However, Ravida continued to provide financial support for Gomez and treat her as his daughter, and she regularly stayed at his house during her childhood. Christina testified that Gomez had considered Ravida her father her entire life. After Gomez got her driver

4

license, she sometimes drove Ravida to appointments and to do errands. Ravida suffered from anxiety attacks and rarely drove himself.[3]

"At the time of his death, Ravida had approximately $378,000 in multiple bank accounts and his house was valued at $525,000. He held several of his bank accounts in trust for Gomez, and occasionally mentioned to bank employees in Gomez's presence that he wanted to be sure his accounts were set up to take care of her. After Ravida's murder, Christina and Gomez filed letters of administration seeking authorization to administer his estate and to establish that Gomez was entitled to inherit the entire estate except for a stamp and coin collection.

"On Friday evening, October 28, 2005, Christina drove Gomez to Ravida's house because Gomez told her that Ravida wanted to see her (Gomez) and that she was going to visit him and help him with whatever he needed at his house. Christina picked Gomez up at around 9:00 p.m. and Gomez told her that she had to return to Ravida's house on Sunday to take Ravida on errands because he was not feeling well enough to run errands that evening.

"Christina drove Gomez back to Ravida's house on Sunday, October 30. Batista was at the house when Gomez arrived. Ravida was on the computer looking at an online dating website and told Gomez that if Batista did not marry him, he would find another

---

3    "Christina testified that Ravida had been diagnosed as paranoid schizophrenic. Ramona Batista, who had a romantic relationship with Ravida dating back to 1992, testified that he suffered from posttraumatic stress syndrome."

5

woman who would and that Gomez and Christina 'would be out of the picture.' He added, 'I won't need you to run me around, and you won't get any of my money.'

"Gomez's relationship with Salinas

"Gomez and Salinas became friends in sixth grade and had an off-and-on friendship through high school. They began a dating relationship in 2003 or 2004 when Gomez was in her second year of college. At that time and until February 2006, Salinas lived in his parent's home with his girlfriend Synath Phang, with whom he had been in a romantic relationship since high school. Phang was unaware of Salinas's relationship with Gomez.

"On a Saturday in the first or second weekend in October 2005, Salinas took Gomez and Christina out to dinner. Salinas told Christina that he loved Gomez and wanted to marry her, but would abide by Christina and Ravida's wish that Gomez graduate from college before marrying him. Salinas then asked Christina to loan him $100,000 to invest in some real property in New Mexico. When Christina told Salinas that she did not have $100,000 to lend him, he suggested she take out an equity loan on her home and told her he needed the money by November 3. Christina said no, but Salinas continued to try to persuade her until she told him he should ask his parents or other relatives for the money.

"Police interviews

"On the night of Ravida's murder, Gomez was interviewed by Deputy Brian Marker at the hospital where she was being treated for her gunshot wound. Gomez told Marker that she had turned right from Troth Street onto 58th Street and was stopped at

6

the stop sign at the intersection of 58th and Ridgeview Avenue when two males on foot approached from her right side. They were both wearing white Halloween masks and black hooded sweatshirts. After they crossed in front of the van, the men approached Gomez's window, pointed a gun at her, and told her to unlock the doors. The men then entered the van through the sliding door behind Gomez and closed the door.

"At their direction, Gomez made a U-turn and drove toward Bain Street. They told Gomez to keep looking straight and not look in the mirror. Ravida panicked and wanted to stop and get out of the van. The men ordered Gomez to turn left on Bain and pull over, and Gomez complied. When Ravida tried to get out of the van he was shot and started making choking noises. The men told Gomez to keep driving and make another U-turn and she complied. She drove and stopped at least two more times at their direction and at some point when she was stopped, they shot Ravida again. The men ordered Gomez to reach into Ravida's pocket to get his wallet and also demanded her wallet and money. Gomez gave them Ravida's wallet and as she reached over to Ravida to see if he was okay, one of the men shot her in the arm. The men then exited the van and fled the scene in a car that had driven up from behind.

"Gomez agreed to go to the sheriff's station to be interviewed by homicide detectives after her release from the hospital. Salinas, who had arrived at the emergency room where Gomez was being treated at around 11:00 p.m., drove Gomez to the sheriff's station where she was interviewed by Sergeant Joseph Pemberton and Detective Ronald Waters. Pemberton asked Salinas to stay at the station so he could talk to him after

7

interviewing Gomez, but Salinas left the station before the officers completed Gomez's interview.

"Gomez told the detectives that she visited Ravida at least once every weekend to help him with groceries and errands. She had visited him on Friday (October 28) and she accompanied him on several errands. The following Sunday, Christina drove Gomez back to Ravida's house at around 4:40 p.m. Batista was at Ravida's house and Ravida was showing his list from an internet dating website. Gomez said he was 'trying to find another girlfriend because he couldn't stand [Batista] anymore.' After Batista left, Gomez drove Ravida to K-mart and Albertsons, and then to a Chinese restaurant where they had dinner. They were driving back to Ravida's house from the Chinese restaurant, when the events that led to the shootings occurred. Gomez essentially repeated the account of those events that she had related to Deputy Marker in the hospital.

"Gomez returned to the sheriff's station with Christina for a third interview on February 7, 2006. Gomez initially repeated the version of the incident she had given in the previous two police interviews. She explained that she drove on the 'small streets' on the way back to Ravida's house from the Chinese restaurant instead of taking the usual direct route because Ravida wanted to see her old elementary school.

"Investigator Tom Dorsey expressed his disbelief of Gomez's story and told Gomez that he thought '[t]his thing got way over your head. It got way over your head. It was something that wasn't supposed to happen the way it happened.' Gomez responded that someone Ravida hired to work on his ranch could have been one of the perpetrators. When asked to divulge any other information she was withholding, Gomez told the

8

officers that Ravida had problems with his next-door neighbors and that the perpetrators could be workers the neighbors hired to work on a wall they were constructing. Gomez said the workers 'trashed' Ravida's property. When Waters and Investigator Masson pressed Gomez to reveal the name of the person who shot Ravida, Gomez expressed fear that 'they' would come after her and Christina. She then claimed that she heard on the street that the shooter was hired by the uncle of someone named Salvador who was in her high school graduating class and had worked on Ravida's neighbor's wall. Gomez said the uncle had fled to Mexico.

"The officers interviewing Gomez made it clear that they did not believe her story and pressed her to tell them who shot Ravida. Gomez eventually told the officers that 'it wasn't supposed to be like that[,]' and that '[t]hey were just going to take the van and the money and leave.' She said that one of the perpetrators went by the name 'Freddy' and she did not know the other's name. After being read her *Miranda* rights, Gomez told the officers that 'they' (the perpetrators) knew Ravida had some money and had recently purchased the van and had insurance, so they planned to sell the van for parts and take Ravida's cash. The plan was supposed to have been carried out on Friday, October 28, but Gomez did not drive to the appointed place that night because she did not want anything to happen to her father. However, she agreed to try again on Sunday the 30th but asked for assurance that nothing would happen to her or Ravida. The plan was for her to drive down 58th Street and meet the perpetrators either at the stop sign at Troth or the stop sign at Ridgeview.

9

"Gomez's description of the events leading to Ravida's death was similar to her previous accounts. She said the perpetrators shot Ravida because they 'got scared' when he had an anxiety attack and 'flipped out,' and then shot her to 'cover their tracks.' When asked why she participated in the plan, Gomez said she thought it was 'just a big hoax' and that she was not thinking clearly and did not know why she did it.

"Salinas made several calls from his cell phone to Gomez's cell phone during the February 7, 2006 interview. After his third call, Masson asked Gomez to call him back and put him on speaker phone. Gomez's first call went to Salinas's outgoing voicemail message, which said 'Welcome to my nightmare,' a line spoken by the horror movie character Freddy Krueger. Following that call, Gomez engaged Salinas in a series of phone conversations that were on speaker phone and recorded by the police.[4]

"During one of the taped phone conversations, Gomez told Salinas that she was going to jail and that she had told the police the truth. Salinas asked, 'What truth?' Gomez responded she had told the police that Freddy and 'another guy was in [on] it, and that we talked about it.' Salinas asked, 'Did you say I did it, babe?' Gomez said, 'Yeah, I said we talked about it, that we had a plan.' Salinas then asked if Gomez had told the police that she 'did it.' Gomez said, 'I guess so. I told them that I drove there.' She added, 'I told them I drove to the spot where we were supposed to meet.' Salinas asked, 'Who and who?' Gomez replied, 'I don't know, whoever was with Freddy. I don't know.'

---

4       "At trial, the parties and the court referred to this series of taped phone conversations between Gomez and Salinas as 'the pretext call.' "

"Salinas asked Gomez who was with Freddy and she said she did not know. When Salinas asked if she knew where Freddy was, she said she did not know but she had told the police 'that we talked about it.' Salinas asked, 'Who and who talked about it?' Gomez said, 'You and me.' Salinas then asked, 'And who—who did it though?' Gomez replied, 'Freddy and whoever he was with, that the plan was that you guys were just going to take the car and the money, and nothing was supposed to happen to me and my dad.'

"Gomez told Salinas that she had said Freddy talked to him about 'setting it up' and that Salinas had talked to her. Salinas expressed concern that Gomez was involving him in the murder, and Gomez said, 'I know, because we talked about it. That's the thing. I'm not saying that you did it. I'm just saying that you know who did it.' She explained that she meant Salinas knew about Freddy, who was an acquaintance of Salinas. Salinas complained that Gomez was blaming him for the murder, and Gomez said, 'I'm not blaming you, but you need to talk to the cops and tell them that . . . it was Freddy and this other guy.' Salinas responded, 'What if I can't find Freddy?'

"Salinas agreed to tell the police that 'Freddy and that other guy did it,' and Gomez said, 'Yeah, that they told you to set it up—to talk to me about setting it up for me meeting you guys—those guys there.' Gomez told Salinas he needed to try to find out the identity of the other guy who was with Freddy. She then essentially coached Salinas on the latest story she had given the police, i.e., that Freddy and the other guy were supposed to just steal the van for the parts, that Salinas 'set it up' and told Gomez where to meet

them, and that nothing was supposed to happen but Ravida 'spooked them, and the outcome of it was awful.'

"When Salinas again complained that the story Gomez had told the police put the blame on him, Gomez said, 'I'm not blaming you—you. I'm just saying that you're the one who told me about the set up.' Salinas said, 'But that's what I'm saying babe, if I can't find Freddy I don't know what's gonna happen. You know, that's the crazy part.' He later said to Gomez, '[I]f you change your story or whatever, they're going to blame it all on you and me or whatever, you know.' Salinas repeatedly expressed concern that the police would not be able to find Freddy and that he and Gomez would be blamed for the murder as a result. At one point, Salinas said, '[I]f they can't find this guy, they're going to get mad. You know what I'm saying? They're going to try to turn you against yourself, or against me, or against whoever, you know.'

"The next day (February 8, 2006) Salinas came to the sheriff's station for a recorded interview. Referring to his recorded phone conversations with Gomez the day before, Salinas told the officers that he told Gomez he would tell the detectives everything he knew about the 'dude . . . that I met at the races[.]' He said he told her to make sure to tell the detectives 'how you want to clear me up.' He told the officers that he did not know what Gomez had said about him and did not want to say something stupid, and that Gomez had said it was her fault. He continued: 'I don't want to place the blame . . . on her either, 'cause I'm like, okay, that there is a mistake to be made. Okay— it was made. You know? And I'm like, okay, let's go from here. You know? . . . When I talked to her, she was just like, all telling me this stuff, and I'm like, fine. You know?

12

But make sure you tell them that, that you guys want—You know, you want the truth and everything. I'm like, make sure you tell them. I'm like, don't make it seem, like it was me. You know? Like, don't make it seem that, you know, that I acted alone or whatever.'

"Other prosecution evidence

"Salinas was a fan of horror movies and collected memorabilia from that genre, including masks, costumes, photographs, statues, and figurines. His collection included Freddy [Krueger] masks and white hockey masks worn by the horror movie character Jason. Freddy [Krueger] was one of his favorite horror characters.

"On 7:04 p.m. on Friday, October 28, 2005, Gomez called Salinas's cell phone from her cell phone, and the call became a three-way call when Salinas connected with a third number in the 714 area code. On October 30, 2005, Salinas made a call from his cell phone to Gomez's cell phone at 7:35 a.m. The same day, Gomez made calls from her cell phone to Salinas's cell phone at 10:24 a.m., 10:41 a.m., 1:24 p.m., 2:40 p.m., and 3:05 p.m. The 3:05 p.m. call became a three-way call when Salinas called an area code 714 number. At 3:19 p.m. Salinas called Gomez's cell phone. Gomez arrived at Ravida's house at 3:30 p.m.

"*Defense Evidence*

"Gomez did not testify at trial or call any witnesses.

"Salinas called five members of Aurora Hernandez's extended family as alibi witnesses. Each of them testified that Salinas was at the Hernandez residence on the night of Ravida's murder. Salinas testified that he did not have anything to do with Ravida's murder. He claimed that the purpose of going to dinner with Gomez and

13

Christina in October 2005 was to tell Christina that Gomez was pregnant with his baby. He testified that Christina became angry and demanded they get married, and that he wanted to keep the baby but Gomez did not. He denied that he asked Christina for $100,000.

"Sometime in 2005, Salinas met a person named Freddy at street races he was attending. He saw Freddy again a few weeks later when he was at the races with Gomez. Freddy inquired about Gomez's availability and Salinas indicated she was available if Freddy wanted 'to make an advance at her.' The three talked for awhile and Gomez and Freddy exchanged phone numbers.

"Salinas testified that on October 30, 2005, Phang dropped him off at the Hernandez house at around 7:00 p.m. He played billiards in the 'pool house' with friends for over an hour and then went inside the house and watched television. Phang arrived around 9:00 p.m. and drove Salinas and his friends to a Hollywood Video store and a Rite Aid. After buying ice cream cones at Rite Aid, the group returned to the Hernandez house at around 10:00 p.m. About an hour later, Salinas received a call from Christina to go see Gomez at the hospital. He drove back to his house with Phang, dropped her off, and then drove to the hospital. After Gomez was released from the hospital, Salinas drove her to the sheriff's station. He waited in the lobby of the station while Gomez was being interviewed, and left when Christina came out and told him he could leave.

"Regarding his phone conversations with Gomez on February 7, 2006 that were recorded by the detectives interviewing Gomez, Salinas testified that he did not know where Gomez was or who was with her. He did not think the police were listening; he

14

thought Gomez might be with Freddy from the street races or someone else and that his life might be in danger if he said something against Freddy."

DISCUSSION

I. *Summary Denial of Gomez's Section 1170.95 Petition*

Gomez contends the court erred in summarily denying her petition to vacate her 2009 murder conviction under section 1170.95. The People contend the court properly denied Gomez's petition without issuing an order to show cause (OSC) because the special circumstance findings against her render her ineligible for relief under section 1170.95 as a matter of law. We agree with the People.

<u>Section 1170.95 procedure</u>

In 2018, "the Governor signed Senate Bill No. 1437 [(S.B. 1437)] . . . in order to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) S.B. 1437 also added Penal Code section 1170.95, which created a [petition] procedure whereby a person whose felony murder conviction was final, but who could not have been convicted under the amended statutes, could petition to have the conviction vacated." (*People v. Ramirez* (2019) 41 Cal.App.5th 923, 927 (*Ramirez*).)

"S.B. 1437 added section 1170.95 and amended sections 188 and 189. As amended, section 188 limits a finding of malice: 'Except as stated in subdivision (e) of

15

Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3).) As added by S.B. 1437, subdivision (e) of section 189 reads: 'A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [including robbery] in which a death occurs is liable for murder only if one of the following is proven:

'(1) The person was the actual killer.

'(2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

'(3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.'

"A petition under section 1170.95 must allege the following: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' (§ 1170.95, subd. (a)(1)-(3).) In addition, the petition must include the petitioner's declaration showing eligibility under all three enumerated conditions, as well as the superior court case number, year of

16

conviction, and any request for appointment of counsel. (§ 1170.95, subd. (b)(1).) Section 1170.95, subdivision (c) requires the superior court to review the petition and determine whether the petitioner has made a prima facie showing of entitlement to relief. Unless time is extended for good cause, the prosecutor must file a response and the petitioner may file a reply within specified time limits. (§ 1170.95, subd. (c).)

"A prima facie showing of eligibility triggers the trial court's obligation to issue an order to show cause and either hold a hearing, give the parties an opportunity [to] waive a hearing and stipulate to eligibility, or '[i]f there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, the court shall vacate the petitioner's conviction and resentence the petitioner.' (§ 1170.95, subd. (d)(2); see subds. (c), (d)(1).) If a hearing is held, the prosecution has the burden to prove beyond a reasonable doubt, that petitioner is ineligible for resentencing. (§ 1170.95, subd. (d)(3).) If the prosecution fails to sustain its burden of proof the trial court is required to vacate the prior conviction and resentence the petitioner on the remaining charges. (§ 1170.95, subd. (d)(3).)" (*Ramirez*, *supra*, 41 Cal.App.5th at pp. 928-929.)

Gomez's section 1170.95 petition

In May 2019, Gomez filed a petition under section 1170.95 in which she asserted that she "was charged as an aider and abettor[,]" and that "[t]here was zero evidence she directly aided and abetted the murder, and it is clear the prosecution proceeded under a felony murder theory." Gomez contended there was insufficient evidence to support the jury's special circumstance findings against her because under section 189, subdivision

17

(e)(3), *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), "and their progeny, [she] did not evince reckless indifference to human life."[5]  In her supporting declaration, Gomez stated she believed that she qualified for resentencing under S.B. 1437 and that she "would not be able to be convicted of first or second degree murder because of changes to section 189 made effective January 1, 2019."

---

[5]     *Banks* and *Clark* "clarified 'what it means for an aiding and abetting defendant to be a "major participant" in a crime who acted with a "reckless indifference to human life." ' " (*In re Taylor* (2019) 34 Cal.App.5th 543, 546 (*In re Taylor*).)  *Banks* identified certain factors to consider in determining whether a defendant was a major participant; *Clark* identified factors to guide the determination of whether the defendant acted with reckless indifference to human life.  The *Banks* and *Clark* factors are derived from the United States Supreme Court's opinions in *Tison v. Arizona* (1987) 481 U.S. 137, and *Enmund v. Florida* (1982) 458 U.S. 782.  (*In re Taylor*, at pp. 551-554.)

The People, through the District Attorney, filed a response to Gomez's petition, in which they argued that, "notwithstanding the People's constitutional objections [to S.B. 1437], the court should summarily deny the petition because a review of [the] readily available records . . . [reveals that] the jury found both robbery and kidnapping special circumstances true based on CALCRIM No. 703[,] which required the jury to find intent to kill or major participation/reckless indifference for an aider and abettor."[6]

At the outset of the hearing on Gomez's petition, the prosecutor stated, "There are robbery and kidnapping . . . special circumstances found true. Both held up on appeal. CALCRIM 703 was given that required the jury to find that the defendant was either a major participant with reckless indifference or had an intent to kill." The court immediately ruled, "Petition is denied. The defense objects for the record."

Analysis

[6] CALCRIM No. 703 at the time of Gomez's trial stated: "In order to prove [this] special circumstance for a defendant who is not the actual killer but who is guilty of first degree murder [as an aider and abettor or a member of a conspiracy], the People must prove either that the defendant intended to kill, or the People must prove all of the following: [¶] 1. The defendant's participation in the crime began before or during the killing; [¶] 2. The defendant was a major participant in the crime; AND [¶] 3. When the defendant participated in the crime, he acted with reckless indifference to human life."

The current version of CALCRIM No. 703 includes a bracketed portion containing the *Banks* factors as "[a]mong the factors [the jury] may consider" in determining whether or not the defendant was a major participant. (Judicial Council of Cal. Crim. Jury Instns. (2019), CALCRIM No. 703.) The bench notes state that the *Banks* court "stopped short of holding that the court has a sua sponte duty to instruct on those factors." (Bench Note to CALCRIM No. 703, p. 423.)

19

We conclude the trial court properly denied Gomez's section 1170.95 petition without issuing an OSC and holding an evidentiary hearing because the record of conviction established, as a matter of law, that Gomez is ineligible for relief under section 1170.95. To obtain relief from her felony-murder conviction under section 1170.95, Gomez would have to establish that she did not aid and abet, counsel, command, induce, solicit, request or assist the actual killer with the intent to kill or as a major participant in the underlying felonies (robbery and kidnapping) who acted with reckless indifference to human life. Gomez's jury was instructed that to prove the special circumstance allegations "for a defendant who is not the actual killer but who is guilty of first degree murder as [an aider and abettor or a member of a conspiracy], the People must prove either that the defendant intended to kill, or the People must prove all of the following: [¶] 1. The defendant's participation in the crime began before or during the killing; [¶] 2. The defendant was a major participant in the crime; AND [¶] 3. When the defendant participated in the crime, [he or she] acted with reckless indifference to human life." (CALCRIM No. 703.)[7]

Thus, in finding the robbery and kidnapping special circumstance allegations true, the jury necessarily found that Gomez either participated in the alleged robbery and kidnapping with the intent to kill Ravida, or that she was a major participant in those crimes who acted with reckless indifference to Ravida's life. Because either finding

---

[7]     The present record does not include the jury instructions given at trial, but Gomez does not dispute that the jury was instructed with CALCRIM No. 703.

20

would allow Gomez to be convicted of first or second degree murder notwithstanding the changes to sections 188 and 189 made effective January 1, 2019, Gomez is not eligible for relief from her murder conviction under section 1170.95. (§ 1170.95, subd. (a)(3).)

Gomez contends the court erred in looking beyond the allegations of her petition in determining whether she made a sufficient prima facie showing for the court to issue an OSC and hold an evidentiary hearing under section 1170.95, subdivisions (c) and (d). We disagree.

The Court of Appeal in *People v. Lewis* (2020) 43 Cal.App.5th 1128 (*Lewis*) held that in evaluating whether a petitioner has made the initial prima facie showing required by section 1170.95, the trial court may properly consider the petitioner's record of conviction, which includes the reviewing court's prior opinion in the petitioner's direct appeal. (*Id*. at pp. 1136, fn. 7, 1137-1138; *People v. Verdugo* (2020) 44 Cal.App.5th 320, 329 (*Verdugo*) ["The same material that may be evaluated under [section 1170.95,] subdivision (b)(2)—that is, documents in the court file or otherwise part of the record of conviction that are readily ascertainable—should similarly be available to the court in connection with the first prima facie determination required by subdivision (c)."].)[8]

*Lewis* embraced the view that allowing the trial court to consider its file and the record of

---

8    The *Verdugo* court observed that the final iteration of S.B. 1437, "which authorizes the [trial] court both to dismiss the petition if it lacks any required information and to determine if there is a prima facie showing the petitioner falls within the provisions of [section 1170.95] before ordering briefing, indicates the Legislature's intent that the superior court perform a substantive gatekeeping function, screening out clearly ineligible petitioners before devoting additional resources to the resentencing process." (*Verdugo*, *supra*, 44 Cal.App.5th at p. 331.)

conviction is "sound policy" because " '[i]t would be a gross misuse of judicial resources to require the issuance of an order to show cause or even appointment of counsel based solely on the allegations of the petition, which frequently are erroneous, when even a cursory review of the court file would show as a matter of law that the petitioner is not eligible for relief.' " (*Lewis*, p. 1138.)

We agree with *Lewis* and conclude that the trial court here properly looked to the record of conviction, including the jury instructions given at trial, in determining whether Gomez made the required prima facie showing under section 1170.95. Looking beyond the face of a section 1170.95 petition to the record of conviction is particularly appropriate where, as here, the petition contains only conclusory allegations that the petitioner is entitled to relief. Gomez's petition did not dispute the facts stated in our prior opinion or contend they misstated the evidence, and did not specify any facts or evidence that would support a finding that she did not act with either the intent to kill or as a major participant with reckless indifference to human life. Based on the record of conviction, the court properly denied Gomez's petition without considering further briefing or conducting an evidentiary hearing.

Gomez's main contention on appeal is that she is entitled to relitigate whether she was a "major participant" in the felonies underlying her murder conviction and whether she acted with "reckless indifference to human life" in light of the clarification of those phrases in *Banks* and *Clark*. She observes in her reply brief that special circumstance findings have been vacated on petitions for habeas corpus in light of the clarification of those phrases in *Banks* and *Clark*. (See, e.g., *In re Miller* (2017) 14 Cal.App.5th 960; *In*

22

*re Taylor*, *supra*, 34 Cal.App.5th 543; *In re Ramirez* (2019) 32 Cal.App.5th 384, 408; *In re Bennett* (2018) 26 Cal.App.5th 1002.)  As her observation suggests, Gomez's bid to relitigate her felony murder conviction under section 1170.95 in light of *Banks* and *Clark* is in effect a challenge to the sufficiency of the evidence to support the robbery and kidnapping special circumstance findings against her.  The People contend a petition under section 1170.95 "does not provide defendants an opportunity to challenge or relitigate the merits of their underlying judgments of conviction."  The People submit Gomez's "remedy is to challenge her special circumstance finding[s] in a habeas petition raising [her] *Banks/Clark* claim."

Gomez unsuccessfully challenged the sufficiency of the evidence to support her special circumstance findings in her direct appeal from the judgment.[9]  In her section 1170.95 petition, Gomez again challenged the sufficiency of the evidence to support those findings.  We agree with the People that the proper procedure for her to challenge her special circumstance findings based on clarification of the relevant law in *Banks* and *Clark* is to bring a petition for habeas corpus, in which she would bear the burden of showing the findings must be vacated on the ground there is insufficient evidence to support them.  (*People v. Duvall* (1995) 9 Cal.4th 464, 474 ["Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the

---

9    In her prior appeal from the judgment, Gomez challenged the sufficiency of the evidence to support findings that that a robbery and kidnapping occurred; she did not challenge the sufficiency of the evidence to support findings that she acted with the intent to kill or with reckless indifference to human life as a major participant in the robbery and kidnapping.

petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them."].)

In an evidentiary hearing on a section 1170.95 petition to determine whether there is sufficient evidence to support her murder conviction on a felony murder or natural and probable consequences theory, the People would bear the burden of proof beyond a reasonable doubt. (§ 1170.95, subd. (d)(3).) To make its true findings on the special circumstance allegations against Gomez, the jury was required to find that Gomez either acted with the intent to kill, or that she was a major participant who acted with reckless indifference to human life in the robbery and kidnapping of Ravida. The People should not be required to prove beyond a reasonable doubt, a second time, that Gomez satisfied those requirements for the special circumstance findings. Considering the different burdens of proof in a habeas proceeding and a proceeding under section 1170.95, we conclude that a petition for writ of habeas corpus is the appropriate vehicle for Gomez to challenge her special circumstance findings. If Gomez were to succeed in challenging the special circumstance findings in a habeas proceeding, she would then be in a position to successfully petition under section 1170.95 to vacate her murder conviction. (See *Ramirez*, *supra*, 41 Cal.App.5th 923 [Where appellate court determined on a habeas petition that the defendant was not a major participant in the underlying felony and did not act with reckless indifference to human life, trial court was required to vacate

24

defendant's murder conviction and resentence him under section 1170.95, subdivision (d)(2).].)[10]

### DISPOSITION

The order denying Gomez's petition under section 1170.95 to vacate her 2009 murder conviction is affirmed.

O'ROURKE, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.

---

[10] In light of our conclusion that Gomez is ineligible for relief under section 1170.95, as a matter of law, we further conclude that to the extent the court erred in ruling on her petition without affording her the opportunity to file a reply to the People's response and without her being present, the error was harmless under either the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (no reasonable probability of more favorable outcome) or the more stringent test under *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt).

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOANNA GOMEZ,<br><br>    Defendant and Appellant. | D076101<br><br>(Super. Ct. No. RIF128455)<br><br>ORDER MODIFYING OPINION,<br>AND CERTIFYING OPINION FOR<br>PUBLICATION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 29, 2020 be modified as follows:

On page 21, the citation to *People v. Lewis* (2020) 43 Cal.App.5th 1128 in the first sentence of the second paragraph is to be modified to show the California Supreme Court's grant of review in that case by inserting a comma after the page number "1128" followed by "review granted, March 18, 2020, S260598"– so that the citation reads: "*People v. Lewis* (2020) 43 Cal.App.5th 1128, review granted, March 18, 2020, S260598 (*Lewis*)".

In the same paragraph on page 21, the citation to *People v. Verdugo* (2020) 44 Cal.App.5th 320 following the first sentence is to be modified to show the California Supreme Court's grant of review in that case by inserting a comma after the page number

"329" followed by "review granted, March 18, 2020, S260493"– so that the citation reads: "*People v. Verdugo* (2020) 44 Cal.App.5th 320, 329, review granted, March 18, 2020, S260493 (*Verdugo*)".  There is no change in the judgment.

The opinion in this case filed on June 29, 2020, was not certified for publication. It appearing the opinion meets the standard for publication certified in California Rules of Court, rule 8.1105(c), the requests pursuant to rule 8.1120(a) for publication are GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of the opinion be deleted and replaced with the words "Certified for Publication" followed by a footnote designated with an asterisk, which shall read: "Pursuant to California Rules of Court, rule 8.1105, this opinion is certified for publication.  It is further ordered the opinion herein be published in the Official Reports in conformity with this order."

BENKE, Acting P. J.

Copies to:  All parties

2